## DE LUXE CHECK PRINTERS, Inc. v. KELM.

## DE LUXE CHECK PRINTERS, Inc. v. UNITED STATES.

### Nos. 1747, 1748.

United States District Court,
D. Minnesota, Third Division.

Sept. 5, 1951.

Dorsey, Colman, Barker, Scott & Barber by John W. Windhorst, Minneapolis, Minn., for plaintiff.

Maurice P. Wolk, Sp. Asst. to Atty. Gen., for defendants (Theron L. Caudle, Asst. Atty. Gen., Clarence U. Landrum, U. S. Atty., and William P. Murphy, Asst. U. S. Atty., St. Paul, Minn., on the brief).

DONOVAN, District Judge.

The above-entitled cases were consolidated and tried to the Court without a jury on the 21st day of February, 1951, in the courtroom of the Federal Courts Building, in the City of St. Paul, Minnesota.

Plaintiff commenced these actions to recover certain retailers' excise taxes on luggage paid under protest, for the period from April 1, 1944, to October 31, 1948. It is admitted by defendants that plaintiff did pay the taxes. and that it duly filed a claim for refund. The property taxed was an imitation leather folder, hereinafter referred to as the cover.

Plaintiff contends that the cover here involved in litigation is not included in Section 1651 of the Internal Revenue Code, 26

U.S.C.A. § 1651, as interpreted by Treasury Regulation 51, Section 320.60.

It is the contention of defendants that the cover is within the purview of the above sections. Defendants further argue that even if the court should find the cover to have been improperly taxed, plaintiff cannot recover the taxes paid after December 1, 1947, because it has not shown that the tax was not passed on to the consumer in accordance with the provisions of Section 2407 of the Internal Revenue Code, 26 U.S.C.A. § 2407.

Plaintiff is a Minnesota corporation, having its principal place of business in St. Paul. It is chiefly engaged in the business of manufacturing and retailing bank checks, about thirty-two percent of its business consisting of the sale of personalized checks bearing the name of the bank and the depositor. These are made up to order in packets of 200 checks, and are distributed exclusively through the bank. The packets are usually ordered in groups of six or multiples thereof, because in this quantity plaintiff is able to sell at a price more favorable to the customer. A cover is supplied with each original order for personalized checks, and with any repeat order when specifically requested. The price of the packet is the same, whether or not the cover is included. The cover is not manufactured by the plaintiff, but is purchased by it from the manufacturer.

Plaintiff began the promotion of these personalized check packets in 1938, charging $2.50 for the packet of 200 checks. Between 1938 and July of 1941, because of improved methods in purchasing, manufacturing and selling, the price of the packet was reduced to $1.25. In March, 1942, plaintiff initiated the practice of selling for a lower price in groups of six, establishing three prices which were not altered until December 1, 1947. These prices were:

(a) single orders........... $1.25;
(b) orders of 2 to 5........ 1.10 each;
(c) orders of 6............ 1.00 each.

These prices produced an average sale of $1.15. Effective December 1, 1947, plaintiff increased all prices ten cents, but this resulted in an average increase of only five cents, because many banks then began to order under the group plan.[1]

The tax herein became effective on April 1, 1944. Until the summer of 1945, when it was notified to the contrary, plaintiff believed that the cover was not subject to the tax. In August of that year it paid the assessed tax, with interest, for the period from April 1, 1944, to June 30, 1945. Thereafter, plaintiff paid the tax at the end of each month, in accordance with the statutory provisions.

Plaintiff's president testified that in figuring the expenses of production in contemplation of the December 1, 1947, price increase the contested tax was not considered. His testimony was, in substance, that costs of labor and material, rising steadily since 1938, finally reached the stage where it was impossible to meet the old price.

The cover is made of a paper-base material known as "Lexide." The cover itself is 6⅞ inches by 6⅜ inches. Each pocket is 6⅜ inches by 2⅞ inches outside measurement, and 2⅝ inches by 6⅛ inches inside measurement. Because United States paper currency is 2⅝ inches by 6³⁄₁₆ inches, it will not lie flat in one of these pockets without being folded.

Counsel's briefs do not disclose, nor has the court been able to find, any court decision on the issue here involved. The main issue is dependent on Section 1651 of the Internal Revenue Code, 26 U.S.C.A. § 1651.[2]

1. The record shows that during this same period plaintiff's lithographed check prices were increased three times—from $.93 in April, 1944, to $1.17 in January, 1947.

2. The relevant provisions of said Section 1651 are:

"(a) Tax. There is hereby imposed upon the following articles (including in each case fittings or accessories therefor sold on or in connection with the sale thereof) sold at retail a tax equivalent to 20 per centum of the price for which so sold:

\* \* \* \* \* \*

"(2) Purses, handbags, pocketbooks, wallets, billfolds, and card, pass, and key cases. \* \* \* "

Treasury Regulation 51, Section 320.60, 26 C.F.R. 320.60, interpreting Section 1651, Internal Revenue Code, provides:

"Scope of tax. (a) The tax imposed by section 1651 I.R.C. as added by section 302 of the revenue act of 1943, attaches to the sale by the retailer on and after April 1, 1944, of all articles commonly and commercially known or sold as:

"(1) Trunks, valises, traveling bags, suitcases, satchels, overnight bags, hat boxes for use by travelers, beach bags, bathing suit bags, brief cases made of leather or imitation leather, and salesmen's sample and display cases.

"(2) Purses, handbags, pocketbooks, wallets, billfolds, and card, pass and key cases;

\* \* \* \* \* \*

"(e) The terms 'purses', 'handbags', 'pocketbooks', 'wallets', 'billfolds', and 'card, pass and key cases' include receptacles commonly and commercially known and sold as such, regardless of design, size, or materials from which made, or the purpose for which they are to be used."

In the absence of any judicial interpretation on this issue, defendants urge that we look to the intention of the Congress, citing the report of the Ways and Means Committee accompanying the 1943 act. House Report 871, 78th Congress, 1st Session (p. 25) emphasizes selection of goods "which are clearly luxuries" and states (p. 28): "It is proposed that the tax on luggage be increased \* \* \*. In addition to this the bill extends to various related articles, including wallets and handbags. \* \* \*."

The administrative interpretations of an ambiguous statute by those in charge of its administration and enforcement are to be given great weight by the courts.[3]

It has repeatedly been held that in statutes levying taxes the literal meaning of the words employed is most important, for such statutes are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer.[4]

Both parties agree that the interpretation made by Treasury Regulation 51, Section 320.60, is a satisfactory standard for the application of Section 1651 of the Internal Revenue Code in the instant case. The parties do not, however, agree as to the type of article included in that standard. The plaintiff contends that an article, in order to be subject to this section, must be both commonly and commercially known or sold as such. Defendants, on the other hand, assert that the Regulation by its language contemplates the inclusion of any article of the same general class as those listed. Properly construed, the statute includes in its purview the items that are specifically enumerated. Accepting the interpretation of Regulation 51, included are all of these "receptacles commonly and commercially known as such regardless of design, etc."[5] To extend the scope of the statute beyond the clear and unambiguous meaning is not warranted. The statute here is clear on its face. The taxable receptacles are set out specifically in the statute. Any ambiguity that might here be present comes from the ruling of the Commissioner, and not from the statute itself.[6]

---

3. Albright v. United States, 8 Cir., 173 F. 2d 339, 345; Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457. See also: Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756.

4. United States v. Merriam, 263 U.S. 179, 187, 44 S.Ct. 69, 68 L.Ed. 240; Crooks v. Harrelson, 282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156; Reinecke v. Northern Trust Co., 278 U.S. 339, 49 S.Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397.

5. Sportsman Mfg. Co. v. United States, D.C.Wis., 82 F.Supp. 909.

6. In Douglas v. Edwards, 2 Cir., 298 F. 229, 245, it was said: "We are also mindful of the rule that the regulations and practices of administrative departments are entitled to weight and serious consideration in construing a statute; but opposed to this rule is the familiar one that it is for the courts to construe a statute, and not the executive departments of the government, and where, as here, we are satisfied that the statute requires the construction which we have attributed to it, a treasury regulation rises to no higher dignity than an expression of opinion."

 The testimony and weight of the evidence in this case adequately prove that the cover is not a receptacle commonly and commercially known or sold as one of the items listed in the statute. Plaintiff's president testified, and the testimony was uncontradicted, that plaintiff had expressly ordered its checkbook cover so that it could not be used as a wallet or billfold. It is obvious to the court that the cover was designed for the specific use as a checkbook cover. It has one pocket for the check blanks and one for the record. To stuff other articles in these pockets would strain the seams and probably rip them. Moreover, the pockets are too short for paper currency unless it is folded. As a practical matter, I must conclude that this checkbook cover is neither designed as nor suitable for use as any of the items listed in Section 1651.

The remaining issue is whether or not the plaintiff has borne the burden of showing that the tax was not passed on to the consumer during the period here in question.[7]

Plaintiff has shown that the material cost alone was seven cents per unit greater by January 1, 1948, than it was at the beginning of the tax period. It has also shown that the average increase in price was approximately five cents. Plaintiff's president has testified that this tax was not taken into consideration as a factor in the price increase. This testimony was not shaken on cross-examination, nor did defendants offer any evidence to the contrary.

Defendants contend that the statute imposes upon plaintiff the duty of establishing the manner in which it absorbed the tax. The cases that defendants cite as authority for this position are not relevant to the fact situation here. Plaintiff was at all times proceeding on the theory that the tax was being improperly collected. All assessments were paid under protest.

I am convinced that the plaintiff has conformed with the requirements of Section 2407 and that the tax was not passed on to the consumer.[8]

Plaintiff may present findings of fact, conclusions of law and order, together with appropriate form of judgment.

An exception is allowed to defendants.

See also Albright v. United States, supra.

7. Section 2407(b) of the Internal Revenue Code provides: "(b) No overpayment of tax under this chapter shall be credited or refunded, in pursuance of a court decision or otherwise, unless the person who paid the tax establishes, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, (1) that he has not included the tax in the price of the article with respect to which it was imposed, or collected the amount of tax from the purchaser, or (2) that he has repaid the amount of the tax to the purchaser of the article, or unless he files with the Commissioner written consent of such purchaser to the allowance of the credit or refund.".

8. Con-Rod Exchange v. Henrickson, D.C. Wash., 28 F.Supp. 924; Duradene Co. v. Magruder, D.C.Md., 21 F.Supp. 426, affirmed 4 Cir., 95 F.2d 999.